IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

JO HARRIGAN,                      )
                                  )
            Plaintiff,            )
                                  )
                                  )        CIV-14-113-R
v.                                )
                                  )
CAROLYN W. COLVIN,                )
  Acting Commissioner of Social   )
  Security Administration,        )
                                  )
            Defendant.            )

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of

Defendant Commissioner denying her application for disability insurance benefits under Title

II of the Social Security Act, 42 U.S.C. §§ 416(I), 423. Defendant has answered the

Complaint and filed the administrative record (hereinafter TR___), and the parties have

briefed the issues. The matter has been referred to the undersigned Magistrate Judge for

initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it

is recommended that the Commissioner's decision be affirmed.

I. Administrative History

In her application for benefits, Plaintiff alleged that she was disabled beginning

January 1, 2010, later amended to December 15, 2010, due to diabetes mellitus, "abdominal

problems," possible arthritis in her knees, shortness of breath, and obstructive sleep apnea

("OSA"). (TR 36, 123, 171). Plaintiff has a sixth grade education, and she previously

worked as a veterinary technician and animal nursery worker. (TR 172, 190). At Plaintiff's request, a hearing was conducted before Administrative Law Judge Wampler ("ALJ") on September 17, 2012. (TR 34-45). The ALJ issued a decision on September 28, 2012, finding Plaintiff was not disabled within the meaning of the Social Security Act. (TR 19-28). The Appeals Council considered additional evidence presented by Plaintiff (TR 5), but declined to review the decision of the ALJ. (TR 1-3). The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

II. ALJ's Decision

Following the agency's well-established sequential evaluation procedure, the ALJ determined at step one that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of January 1, 2010.[1] At step two, the ALJ found that Plaintiff had severe impairments due to diabetes mellitus, hypertension, hyperlipidemia, mild obesity, osteoarthritis of her knees, chronic obstructive pulmonary disease ("COPD"), shortness of breath on exertion, OSA, gastrointestinal reflux disease ("GERD"), major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder ("PTSD"). (TR 21). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of a listed impairment, and she was

---

[1]The ALJ failed to recognize in the decision that Plaintiff amended her alleged disability onset date to December 15, 2010, during the hearing. (TR 36). This apparently inadvertent mistake is not relevant to the merits of her claims, and Plaintiff herself points to the original alleged disability onset date as the date on which she alleged her disability began, also without recognizing the amendment of that date. Plaintiff's Opening Brief, at 1 (ECF page 4).

therefore not presumptively disabled. In connection with the analysis of her mental impairments, the ALJ found that Plaintiff's mental impairments had resulted in mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no extended episodes of decompensation.

At the fourth step, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a wide range of semiskilled, light work. This RFC was further limited by the need to avoid more than occasional exposure to concentrated levels of fumes, odors, dust, gases, or poor ventilation, and the ability to understand, remember, and carry out simple and some complex instructions and tasks, frequently relate to and interact with co-workers, supervisors, and patients, and only occasionally relate to and interact with the general public. (TR 22). The ALJ determined that this RFC for work precluded the performance of any of Plaintiff's previous jobs.

Reaching the fifth and final step of the sequential analysis, the ALJ found that Plaintiff retained the capacity to perform other jobs available in the economy. The ALJ found that Plaintiff's nonexertional impairments had little or no effect on the occupational base of unskilled, light work. Using the agency's Medical-Vocational Guidelines, commonly known as the grids, as a framework for decisionmaking, the ALJ concluded that she was not disabled and not entitled to benefits.

III. General Legal Standards Guiding Judicial Review

The Court must determine whether the Commissioner's decision is supported by

3

substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

The Social Security Act authorizes payment of benefits to an individual with disabilities. 42 U.S.C. § 401 *et seq.* A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord, 42 U.S.C. § 1382c(a)(3)(A); see 20 C.F.R. §§ 404.1509, 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than twelve months. Barnhart v. Walton, 535 U.S. 212 (2002).

IV. Relevant Medical Evidence

In March 2008, Plaintiff underwent surgery to repair a recurrent incisional hernia. (TR 884). Pulmonary function testing of Plaintiff in June 2011 revealed mild COPD. (TR 491-492). Although Plaintiff has occasionally complained of chest pain and shortness of breath,

cardiac testing, including echocardiogram, left heart catheterization, and angiogram, have revealed no significant coronary artery disease, according to Dr. Velury, her treating physician. (TR 477-481). On May 12, 2011, Dr. Velury noted Plaintiff's hypertension was controlled and that she had advised Plaintiff to start an exercise program. (TR 481).

In August 2009, Plaintiff sought treatment from an orthopedic specialist, Dr. Axelrod, for her complaint of a nine month history of right knee pain. Dr. Axelrod noted that on examination Plaintiff exhibited full range of motion in her right knee and stable ligaments. (TR 708). Dr. Axelrod interpreted x-rays of her knees as showing right patella chondromalacia and early osteoarthritis in the medial compartment of her right knee, for which she received an injection of Synvisc as the only recommended treatment. (TR 708-709).

Plaintiff underwent a consultative physical examination in June 2011. (TR 489-490). The examining physician, Dr. Cox, reported that Plaintiff complained of shortness of breath on exertion, and Dr. Cox posited that this condition was probably due to (1) possible mild asthma versus environmental factors (including four cats in the home), (2) OSA and Plaintiff's noncompliance with C-PAP therapy, (3) exogenous obesity and Plaintiff's noncompliance with dietary restrictions, (4) poorly controlled diabetes mellitus and Plaintiff's noncompliance with dietary restrictions, (6) hyperlipidemia, and (7) moderate, untreated GERD. (TR 490). A physical examination was normal, and Plaintiff denied anxiety or depression.

In April 2010, Plaintiff sought emergency room treatment for abdominal pain of two

days duration. (TR 805-807). A CT scan of Plaintiff's abdomen was negative, and she was discharged with a diagnostic impression of abdominal pain, post incisional hernia repair. In October 2012, Plaintiff complained of worsening heartburn for several months and abdominal pain (TR 993), and she underwent esphagogastroduodenoscopy ("EGD") testing. Dr. Sawyer examined Plaintiff prior to the procedure and noted that the physical examination was normal. (TR 993-994). Following the procedure, Dr. Sawyer's diagnostic impression was type I hiatal hernia, grade B esophagitis, antral gastritis, and bile reflux, for which medication was prescribed. (TR 999-1000).

In September 2011, Reda Rasco, Psy.D., conducted a consultative psychological evaluation of Plaintiff. Plaintiff reported she had stopped working in 2009 to care for her ill grandfather, that she had been married to her current husband for 17 years, that she went to bed at 4 or 5 a.m. and slept until the afternoon, that her father was abusive to her and her mother but her parents divorced when she was 12 years old, that she dropped out of school in the sixth grade, that she had a history of depression since childhood and rarely left her home, that she could care for herself independently, and that she had depression and anxiety symptoms including crying spells, trembling, appetite decrease, anhedonia, feelings of worthlessness/guilt, withdrawal from society, restlessness, irritability, muscle tension, concentration problems, sleep disturbances, and fatigue. (TR 634-635).

Dr. Rasco conducted a mental status evaluation and reported a diagnostic impression of moderate, recurrent depression, generalized anxiety disorder, and chronic PTSD. Dr. Rasco noted that Plaintiff showed appropriate concentration, insight, and judgment during

the evaluation, although she appeared "emotionally vacant" and in a "depressed state." (TR 636). She needed a medication evaluation for treatment of her symptoms, and her "mental prognosis [was] fair." (TR 637). Dr. Kaspar, an agency medical consultant, opined in October 2011 that Plaintiff could perform simple and some complex tasks, she could relate to others on a superficial work basis, she could adapt to a work situation, and she could relate to the public on a superficial basis. (TR 641).[2]

Plaintiff's treating family physician, Dr. Sultan, saw Plaintiff intermittently between July 2009 and September 2012 for various complaints/conditions. (TR 623, 624, 625, 626, 678, 681, 694, 705, 720, 721, 728, 893, 917, 923). Dr. Sultan opined in August 2011 in a letter addressed to the agency that

> [s]ince 05/20/11, I have seen the patient on multiple occasions for knee pain, arthritis of the knee, diabetes, hypertension, hyperlipidemia, severe headaches of unknown origin, candidiasis, chronic obstructive pulmonary disease, osteoarthritis, diabetes mellitus type 2, grief, depression, tension headache, [and] diabetic neuropathy. The patient was sent to see the specialist for her migraine headache or tension headache. Based on my medical findings the disabled applicant's ability to do work-related activities such as sitting, standing, walking, lifting, carrying, and handling objects are all decreased secondary to her osteoarthritis of the knee and her neuropathy. Hearing and speaking are normal. Traveling could be limited secondary to the neuropathy. Mental activities such as understanding, memory, sustained concentration and persistence, social interaction and adaptation can all be

---

[2]Dr. Kaspar stated in explanation of the RFC assessment that Plaintiff "cannot realate [sic] to the public on a superficial basis." (TR 641). This statement appears to contain an inadvertent error, as common sense would indicate that a claimant either "can relate to the public on a superficial basis" or "cannot relate to the public" at all. The undersigned assumes that the medical consultant inadvertently used the word "cannot" when the consultant intended to use the word "can" in addressing Plaintiff's ability to relate to the public on a superficial basis.

decreased secondary to her depression and chronic headache.

(TR 621, 775). Later, in October 2011, Dr. Sultan authored a second letter addressed to the agency in which the physician noted Plaintiff had a similar "decreased" ability to sit, stand, walk, lift, carry, and handle objects "secondary to her knee pain, her diabetes is uncontrolled and she cannot get up and walk any more as much [sic]." (TR 786). Dr. Sultan also stated that her "[m]ental activities such as understanding, memory, sustained concentration and persistence, social interaction and adaptation are all poor secondary to the grief" she was experiencing because of her grandfather's recent death. (TR 786). Dr. Sultan noted that Plaintiff was "very depressed because she has diabetes, osteoarthritis and severe anxiety." (TR 786).

## V. Credibility

Plaintiff contends that the ALJ's analysis of her credibility was flawed because the ALJ did not affirmatively link any evidence to the recognized factors for determining credibility. Defendant responds that the ALJ's decision provides the requisite analysis with specific references to the medical record and Plaintiff's statements and that no error occurred in the ALJ's credibility determination.

The assessment of a claimant's RFC at step four generally requires the ALJ to "make a finding about the credibility of the [claimant's] statements about [her] symptom(s) and [their] functional effects." Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at * 1 (1996). "Credibility determinations are peculiarly within the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence."

8

Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990).  An ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements" in determining a claimant's credibility.  SSR 96-7p, 1996 WL 374186, at * 4 (1996).  Credibility findings must "be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002)(quotations and alteration omitted).

In addition to objective evidence, the ALJ should consider certain factors in evaluating a claimant's credibility, including the claimant's daily activities; the location, duration, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; any treatment other than medications the individual receives or has received for pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p, 1996 WL 374186, at * 3. See Hamlin v. Barnhart, 365 F.3d 1208, 1220 (10th Cir. 2004)(stating ALJs "should consider" factors set forth in SSR 96-7p).  See also 20 C.F.R. § 404.1529(c)(3)(listing factors relevant to symptoms that may be considered by ALJ).

An ALJ is not, however, required to conduct a "formalistic factor-by-factor recitation of the evidence."  Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).  Employing "common sense" as a guide, the ALJ's decision is sufficient if it "sets forth the specific

evidence he [or she] relies on in evaluating the claimant's credibility." Id.; Keyes-Zachary v. Astrue, 695 F.3d 1156, 1167 (10th Cir. 2012).

Plaintiff testified at the hearing that she cannot work because of stomach "trouble" due to multiple hernia operations and swelling in her ankles and legs due to diabetes. (TR 37). Plaintiff testified she was sometimes "real shaky," she had painful feet due to neuropathy, she had pain and swelling in her knees due to arthritis that made her unable to "walk very far" and required elevating her feet "at least 12 hours a day," and she had migraine headaches three to four times a month lasting up to a week but "usually a day or so." (TR 37-40). Plaintiff stated that "I hardly do anything; I just stay at my house." (TR 40). She had difficulty breathing and used a C-PAP machine for OSA, although she slept only four hours at night and took naps during the day. (TR 41). She estimated she could sit for an hour, stand for 15 minutes, walk two blocks, and lift 10 pounds. She was "really sad a lot," had a low energy level, and had pain and discomfort in her stomach due to hernias.

In this case, the ALJ's decision sets forth specific, multiple reasons for discounting the credibility of Plaintiff's allegations of disabling pain and limitations. The ALJ pointed to medical evidence in the record that was inconsistent with Plaintiff's allegations. For instance, the ALJ noted that "[t]here is no showing that the claimant[ ] has suffered stroke, myocardial infarction, acute heart failure, pneumothorax, recurrent episodes of acute asthma, other episodes of acute respiratory distress, acute organic failure, acute gastrointestinal disorders, or other catastrophic events requiring invasive procedures, hospital admissions, or other crisis treatments." (TR 24).

The ALJ further noted that Plaintiff "has presented an isolated complaint of chest discomfort and some complaints of chronic shortness of breath with exertion, but diagnostic studies have not confirmed the existence of coronary artery disease, valvular disease, lung diseases, or peripheral artery disease. In fact, chest X-rays, EKGs, echocardiograms, left ventriculography, Doppler studies, and pulmonary function studies have been unremarkable or within normal limits. Repeated physical examinations contained in ongoing treatment notes and medical reports of the claimant's treating general practice specialist and other treating and evaluating physicians persistently have shown the claimant to exhibit intact cardiovascular and respiratory/pulmonary functions." (TR 24).

The ALJ also noted that a June 2011 pulmonary function test showed only mildly decreased pulmonary functions. (TR 24). The ALJ further reasoned that although her treating family doctor termed her diabetes poorly controlled, the consultative examiner described her diabetes as poorly controlled due to her noncompliance with dietary restrictions, according to the consultative examiner's and her own report. (TR 24-25). The ALJ also noted there were no neurological deficits on examination and the medical evidence did not document persistent peripheral neuropathy. (TR 24-25).

The ALJ pointed to other medical evidence showing that although Plaintiff had a history of OSA requiring the use of C-PAP therapy, repeated listings of her medications did not include this therapeutic measure, and she reported she was not using the C-PAP machine. Further, although the record showed that she had "experienced some isolated episodes of edema in her lower extremities," this condition had "resolved without requiring long-term

medical therapies or other medical treatments," and she was "not shown to have developed any significant episodes of thrombophlebitis, phlebitis, complicated varicose veins, poorly healing ulcers or lesions, or other significant peripheral vascular disorders or difficulties." (TR 25).

The ALJ found that although Plaintiff had sporadically complained of knee and back pain and diagnostic studies showed mild osteoarthritis in her knees, "[r]epeated physical examinations contained in ongoing treatment notes and medical reports of [her treating and other examining physicians] persistently have shown the claimant to exhibit good strength, joint flexibility, joint instability [sic], motor functions, gait, station, reflexes, sensation, and pulsation throughout her upper and lower extremities and her spine." (TR 25).

The ALJ similarly considered Plaintiff's "history of headaches treated with prognosis medication therapies" and the repeated descriptions in the medical evidence of "her as alert, fully oriented and without signs of acute distress and exhibiting intact mental and cognitive functions (Exs. 1F through 27F)." (TR 26).

Further, the ALJ noted that Plaintiff had not reported significant side effects of her medications or medical evidence of modification of her medications as a result of side effects. With respect to her mental impairments, the ALJ noted that although her treating physician noted in August 2011 that depression was among the diagnoses and that her mental functions were decreased by depression and chronic headaches, "ongoing treatment notes and medical reports . . . do not list depression or any other psychiatric disorder as a diagnosis," "ongoing treatment notes and medical reports . . . persistently described the claimant's mental

12

status examinations as within normal limits," "ongoing treatment notes and medical reports . . . have not found the claimant to suffer psychiatric disorders of such severity and intensity as to require referral for treatment or evaluation by a psychiatrist or other mental health specialist," and, finally, "the claimant has not found her psychiatric disorders to be of such severity and intensity as to require her to seek outpatient psychiatric treatments or counseling." (TR 26).

The ALJ also considered other factors beyond the objective medical evidence that are relevant to the credibility determination, including Plaintiff's daily activities and the opinions of the state agency medical consultants who reviewed the medical evidence in the record and assessed Plaintiff's RFC for work. (TR 26).

Plaintiff contends that her "limited" activities are not "proper" reasons for discounting her credibility. However, a claimant's usual daily activities are certainly one of the factors that an ALJ should consider when analyzing credibility. See, e.g., Wilson, 602 F.3d at 1145 (internal quotation marks and citation omitted); Luna v. Bowen, 834 F.2d 161, 165-66 (10th Cir. 1987). The ALJ in this case considered several relevant factors and did not merely rely on evidence of Plaintiff's daily activities to support the credibility determination. Contrary to Plaintiff's unsupported argument, nothing in the decision indicates that the ALJ determined Plaintiff's RFC for work prior to assessing her testimony and the credibility of her testimony and statements in the record. See Moua v. Colvin, 541 Fed. App'x. 794, 800 (10th Cir. 2013)(unpublished op.)(rejecting plaintiff's claim that ALJ relied on boilerplate language and improperly reversed the RFC and credibility decisions, where it was clear that

ALJ considered the testimony and medical evidence and had "give[n] no indication that he tailored that conclusion to fit his RFC determination"). There is substantial evidence in the record to support the ALJ's credibility determination, and no error occurred with respect to the issue of credibility.

VI. Analysis of Treating Doctor's Opinion

Plaintiff next contends that the ALJ did not properly evaluate Dr. Sultan's August 2011 medical source opinion and failed to consider Dr. Sultan's October 2011 medical source opinion. Defendant Commissioner responds that the ALJ provided legitimate reasons for rejecting Dr. Sultan's August 2011 medical source opinion and any error in the ALJ's failure to expressly address Dr. Sultan's October 2011 medical source opinion, which was similar to the earlier opinion, was harmless.

As set forth previously, Dr. Sultan opined in an August 2011 letter addressed to the agency that the "disabled applicant's ability to do work-related activities such as sitting, standing, walking, lifting, carrying, and handling objects are all decreased secondary to her osteoarthritis of the knee and her neuropathy" and that her "[m]ental activities such as understanding, memory, sustained concentration and persistence, social interaction and adaptation can all be decreased secondary to her depression and chronic headache." (TR 621, 775).

Generally, a treating physician's opinion is entitled to controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting SSR 96-2p, 1996 WL 374188, at

*2). However, "[m]edical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." <u>Pisciotta v. Astrue</u>, 500 F.3d 1074, 1078 (10th Cir. 2007)(internal quotation marks omitted). When an ALJ finds that a treating physician's opinion is not entitled to controlling weight, the ALJ must decide "whether the opinion should be rejected altogether or assigned some lesser weight." <u>Id.</u> at 1077.

"Treating source medical opinions not entitled to controlling weight 'are still entitled to deference' and must be evaluated in light of the factors in the relevant regulations, 20 C.F.R. §§ 404.1527 and 416.927." <u>Newbold v. Colvin</u>, 718 F.3d. 1257, 1265 (10th Cir. 2013)(quoting <u>Watkins</u>, 350 F.3d at 1300).

In the ALJ's decision, the ALJ recognized that Dr. Sultan had authored the August 2011 letter in which the physician opined that Plaintiff's ability to do work-related activities was limited. (TR 23). The ALJ impliedly rejected the opinion, however, because the ALJ did "not find said assessment/opinion to be well-supported by [Dr. Sultan's] contemporaneous medical treatment notes and the other medically acceptable clinical and laboratory diagnostic techniques of record. In addition, the undersigned does not find the treating family practice specialist's August 2011 assessment/opinion to be consistent with other substantial evidence of record." (TR 23).

Plaintiff points only to the report by Dr. Rasco of his consultative psychological evaluation of Plaintiff to support her assertion that the ALJ erred in rejecting Dr. Sultan's medical source opinion. Dr. Rasco did not find that Plaintiff was disabled or unable to perform work-related activities. Plaintiff points to her subjective statements to Dr. Rasco

concerning her mental and physical symptoms, which Dr. Rasco summarized in his report. However, these subjective statements are not objective medical evidence that the ALJ should have considered in evaluating Dr. Sultan's medical source opinion. Further, Dr. Sultan's opinion was vague and did not indicate the degree in which Plaintiff work-related functional abilities were "decreased." Dr. Sultan's October 2011 assessment/opinion was similarly vague. It described Plaintiff's "decreased" exertional abilities and "poor" nonexertional abilities without indicating the degree of any reduction in her work-related abilities. (TR 675). Thus, any error in the ALJ's failure to address the October 2011 assessment/opinion was harmless.

As the ALJ reasoned, Dr. Sultan's brief office notes do not provide objective medical evidence supporting his opinion of a reduced ability to perform physical and mental work-related activities. In any event, the ALJ found that Plaintiff's RFC for work was limited to the performance of semiskilled, light work, and therefore the ALJ credited Dr. Rasco's opinion that Plaintiff's physical and mental impairments had reduced her work-related mental and physical abilities.

The fact that Dr. Sultan described Plaintiff as "disabled" is not objective medical evidence that the ALJ should have considered, as the ultimate issue of disability is reserved to the Commissioner. Plaintiff also points to a singular statement in Dr. Rasco's report that Plaintiff appeared "emotionally vacant" during the evaluation, but Dr. Rasco did not explain this observation or relate this observation to any particular work-related functional limitation.

Plaintiff points to Dr. Rasco's assessment of Plaintiff's functional ability at the time

of the consultative evaluation. Dr. Rasco opined that Plaintiff's GAF score was then 48. In this circuit, a low GAF score, standing alone, "does not necessarily evidence an impairment seriously interfering with a claimant's ability to work." Lee v. Barnhart, 117 Fed.Appx. 674,678 (10th Cir. 2004)(unpublished order). Dr. Rasco did not relate the low GAF score of 48 to any work-related functional abilities, and the ALJ did not err by failing to consider it in connection with the evaluation of Dr. Sultan's medical source opinion.

The ALJ did not err in considering or giving "great weight" to the opinions of the agency medical consultants. "It is the ALJ's duty to give consideration to all the medical opinions in the record. He must also discuss the weight he assigns to such opinions," including the opinions of state agency medical consultants. Keyes-Zachary v. Astrue, 695 F.3d at 1161. See Doyal v. Barnhart, 331 F.3d 758, 764 (10th Cir. 2003)(ALJ is required to consider the opinions of non-treating physicians and to provide specific, legitimate reasons for rejecting such opinions)(citing, e.g., 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p, 1996 WL 374183, *1).

VII. Evaluation of the Evidence

Plaintiff contends that the consultative examiner, Dr. Rasco, rated Plaintiff's prognosis as "fair" and that this "fair" rating is "just like in Cruse, where a mental health professional rated as only 'fair' the mental health abilities for" a claimant. Plaintiff's Opening Brief, at 12 (ECF page 15). In Cruse v. United States Dep't of Health & Human Servs., 49 F.3d 614 (10th Cir. 1995), the Tenth Circuit Court of Appeals concluded that the term "fair" used on a particular mental RFC assessment form was "evidence of disability" because that particular

form described the term "fair" as meaning an inability to function which is severely limited but not precluded. <u>Id.</u> at 618. Contrary to Plaintiff's suggestion, however, the term "fair" as used by Dr. Rasco is not comparable to the use of "fair" in the <u>Cruse</u> decision. Nothing in the record indicates that the term "fair" employed by Dr. Rasco in his consultative evaluation report had the same meaning as the term "fair" that was actually defined on the mental RFC assessment form in <u>Cruse</u>. This allegation has no merit.

VIII. <u>Step Five - Use of the Grids</u>

Plaintiff contends that the ALJ erred in applying the grids to support the step five determination. The Commissioner responds that no error occurred in the ALJ's use of the grids because the ALJ found that Plaintiff's nonexertional impairments had no effect on the occupational base in the performance of unskilled light work.

The Social Security Administration has adopted Medical-Vocational Guidelines, commonly known as grids, which are applied to determine whether a claimant is disabled based on his or her RFC category, age, education, and work experience. <u>See</u> 20 C.F.R. pt. 404, subpt. P, app. 2. In some instances, the grids can be used to satisfy the Commissioner's burden of proof at the fifth step of the sequential evaluation process. "The grids should not be applied conclusively in a particular case, however, unless the claimant [can] perform the full range of work required of that RFC category on a daily basis and unless the claimant possesses the physical capacities to perform most of the jobs in that range." <u>Hargis v. Sullivan</u>, 945 F.2d 1482, 1490 (10th Cir. 1991). "The mere presence of a nonexertional impairment does not preclude reliance on the grids." <u>Thompson v. Sullivan</u>, 987 F.2d 1482,

1488 (10th Cir. 1993). The nonexertional impairment "must interfere with the ability to work." Id. Use of the grids is foreclosed only where the "nonexertional impairments are significant enough to limit [the claimant's] ability to perform the full range of jobs" available. Channel v. Heckler, 747 F.2d 577, 583 (10th Cir. 1984). The grids may be used for a claimant with nonexertional impairments "whenever the claimant can perform a substantial majority of the work in the designated RFC category." Evans v. Chater, 55 F.3d 530, 532 (10th Cir.1995). If an ALJ determines that a nonexertional impairment has only a minimal effect on the range of jobs available for a particular claimant, the ALJ "must back such a finding of negligible effect with the evidence to substantiate it." Talbot v. Heckler, 814 F.2d 1456, 1465 (10th Cir.1987).

At step five, the ALJ found that the grids could be used as a framework for decisionmaking because Plaintiff's nonexertional impairments had a minimal effect on the occupational base for unskilled, light work. (TR 28). Taking notice of the numerous sedentary and light jobs that would be available for a claimant with Plaintiff's RFC and vocational factors, the ALJ found Plaintiff could perform work available in the economy.

As the Commissioner explained in SSR 83-14,

> The rules will also be used to determine how the totality of limitations or restrictions reduces the occupational base of administratively noticed unskilled sedentary, light, or medium jobs.
> A particular additional exertional or nonexertional limitation may have very little effect on the range of work remaining that an individual can perform. The person, therefore, comes very close to meeting a table rule which directs a conclusion of "Not disabled."

Plaintiff argues that the Plaintiff's "pain" and "mental health issues" precluded use of the grids, but Plaintiff points to no medical evidence indicating that nonexertional impairments had more than a negligible impact on Plaintiff's ability to work. The ALJ's finding to the contrary is well supported by the record, and no error occurred with respect to the ALJ's use of the grids to support the step five nondisability decision. See Conkle v. Astrue, 487 Fed. App'x. 461 (10th Cir. 2012)(unpublished op.)(ALJ's use of grids was reasonable where claimant was limited to light work involving simple instructions and no more than incidental work with the public).

Plaintiff makes a final argument that the ALJ's RFC assessment was not specific in terms of Plaintiff's work-related abilities. Plaintiff points to only a portion of the RFC assessment in which the ALJ stated that Plaintiff could "adequately make adaptations to working environments and adequately deal with changes in work processes and environment." (TR 22). This statement may have been vague, but considering the remaining RFC finding of specific exertional and nonexertional abilities, any error in the use of this language was harmless.

RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's application for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before _____ February 9th, 2015, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this

Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this _____20th_____ day of _____January_____, 2015.


GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE